IN RE the MARRIAGE OF: Deborah M. SCHORER, Petitioner-Respondent,

v.

William C. SCHORER, III, Respondent-Appellant.

Court of Appeals

*No. 92–1036. Submitted on briefs March 11, 1993.—Decided May 27, 1993.*

(Also reported in 501 N.W.2d 916.)

387

390

For the respondent-appellant the cause was submitted on the briefs of *John C. Mitby* of *Axley & Brynelson* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *Kenneth B. Axe* and *Donald L.*

*Heaney* of *Lathrop & Clark* and *Daniel J. Lipman* and *Terry F. Peppard* of *Wendel & Center* of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. William Schorer appeals from a judgment divorcing him from Deborah Schorer. He raises five issues: (1) whether the trial court's valuation of his interest in a closely-held corporation was clearly erroneous; (2) whether the court erred by including the appreciated value of inherited stock in the marital estate; (3) whether the court properly considered the tax consequences of the property division; (4) whether the court's award of maintenance was excessive; and (5) whether the court erred when, in a written decision issued after trial, it granted the divorce as of the final day of trial. We decide each issue against Schorer and affirm the judgment.

## I. Facts

The Schorers were married in 1971 and at the time of the divorce had one minor child. William is the chief operating officer and president of a vegetable canning business that has been owned by his family for many years, and Deborah has a degree in nursing and is presently pursuing a license to work as a nurse practitioner. She has worked for the canning business in varying capacities over the years.

The action was commenced in 1988 and a five-day trial was held in July 1991. At its conclusion, the trial court took the issues under advisement and on November 15, 1991, issued a written decision dividing the marital estate, deciding various other issues, and granting the divorce. The decision stated that the divorce was being granted as of July 22, 1991, the last

day of trial. The judgment was entered on March 9, 1992, and William appealed. Additional facts will be discussed below.

## II. Valuation of the Business Enterprise

■

By far the largest asset of the marital estate was William's interest in his family's business — two separate but related closed corporations — and much of the trial was devoted to evidence on the value of that interest. Valuation of a closely-held corporation is a finding of fact which we will not disturb unless it is contrary to the great weight and clear preponderance of the evidence, *Popp v. Popp*, 146 Wis. 2d 778, 797, 432 N.W.2d 600, 607 (Ct. App. 1988); that is, whether it is clearly erroneous. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983).

Several experts testified as to the business' value, but the case centers on the testimony of two of them: Theodore Gunkel, William's principal witness, and William Bonfield, who testified on Deborah's behalf.

Bonfield is an experienced accountant who has worked as an independent consultant in the vegetable canning industry for many years. Gunkel, also an accountant, has had extensive experience in valuing closed corporations. After hearing all the evidence, the trial court accepted Bonfield's valuation as the most reliable and entered findings valuing the business accordingly. As indicated, William challenges those findings.

■

"The weight and credibility to be given to the opinions of [expert witnesses] is uniquely within the province of the fact finder" — in this instance, the trial court. *Bauer v. Piper Indus., Inc.*, 154 Wis. 2d 758, 764,

454 N.W.2d 28, 31 (Ct. App. 1990). "[W]hen the trial judge acts as the finder of fact, and where there is conflicting testimony, the trial judge is the ultimate arbiter of credibility of the witnesses. When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact." *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 676, 273 N.W.2d 279, 282 (1979). Therefore, if a finder of fact accepts the testimony of one expert over that of another expert, who testified differently, and the first expert's testimony is sufficient to support the fact finder's conclusion, it must be sustained. *See Bauer*, 154 Wis. 2d at 765, 454 N.W.2d at 31.

Bonfield valued William's interest in the business by calculating the asset value and analyzing the earnings records of the two companies that comprise it. Asset value was calculated as net book value and the earnings figure was calculated using a "weighted average earnings record, whereby the most current year is weighted five, the preceding year four, and on down 3, 2, 1 for the five previous years." Bonfield then multiplied the weighted average by a figure calculated by comparing the family business to a similar publicly-held corporation. The latter figure was said to represent an "earnings" factor — in simplest terms, the number of dollars an investor would be willing to pay for each dollar of earnings. After adding the asset value of the companies to the earnings figure, Bonfield averaged the two to give them equal weight and calculated the fair market value of William's interest in the business at $5,178,298.

William's witness, Gunkel, criticized Bonfield's analysis as too "mechanistic" because it relied upon primarily historical information. In his own testimony,

Gunkel used a two-step process to value the business, analyzing it on an individual and industry-comparison basis and then developing a "pricing concept" using four separate valuation methods. He said that he did so because there can be no single value for a closely held corporation. He ultimately arrived at four values for the business as a whole, ranging between $1,070,000 and $2,340,000.

In its memorandum decision, the trial court reviewed the competing methodologies employed by the two experts and accepted Bonfield's valuation as the most reliable and credible of the two. In so deciding, the court noted his extensive involvement in the vegetable canning industry and concluded that he was "probably the most familiar" with the various aspects of the industry.

William argues that, for a variety of reasons, Bonfield's valuation was unreliable and the trial court erred in using it as the basis of its decision. We consider whether, for any of the reasons advanced by William, the trial court's findings were clearly erroneous.[1]

---

[1] William also urges us to adopt Revenue Ruling 59–60, 1959–1 C.B. 237 as stating the proper method for valuing closely held corporations upon divorce. The ruling generally tracks Gunkel's approach and has been cited favorably in some jurisdictions. *See, e.g., Nardini v. Nardini,* 414 N.W.2d 184, 190 n.3 (Minn. 1987). The argument is, of course, properly directed to the supreme court, not this court. *See State v. Schumacher,* 144 Wis. 2d 388, 405, 424 N.W.2d 672, 678 (1988) (supreme court is responsible for overseeing the statewide development and implementation of the law).

## A. Bonfield's Valuation Method

William begins by arguing generally that Bonfield's valuation had no basis in law or fact. We disagree.

In divorce actions, trial courts are not required to accept any one method of valuation over another. *See Arneson v. Arneson*, 120 Wis. 2d 236, 248, 355 N.W.2d 16, 22 (Ct. App. 1984). However, in valuing marital assets, courts are obligated to ensure that a fair market value is placed on marital property. *Sommerfield v. Sommerfield*, 154 Wis. 2d 840, 853, 454 N.W.2d 55, 60–61 (Ct. App. 1990). Fair market value is not a valuation method but a definition assuming a sale by one who desires, but is not obligated, to sell, and a purchase by one willing, but not obligated, to buy. *Id.* at 853, 454 N.W.2d at 60. Thus, determining the fair market value of a closely-held corporation turns on the credibility of the expert as well as the methods and analyses employed by the witness to arrive at his or her conclusion.

Here, the trial court selected Bonfield's valuation over Gunkel's based not only on the testimony of the two men but also its own evaluation of their background and experience. And while it agreed with Gunkel that Bonfield's method was "mechanistic," the court concluded that his analysis was superior to Gunkel's (and that of the two other witnesses who testified at the trial) because, among other things, it required fewer "judgment calls." In this regard, the court noted that "[it] logically follows that the more suspect the underlying judgments, the greater the challenge to the validity of the conclusions." Thus, the court preferred Bonfield's method in part, at least, because it was suspicious of some of the assumptions

underlying Gunkel's valuation. Similarly, although the court faulted Bonfield for failing to talk to competitors, suppliers, consultants, regulatory officials and environmental experts, it concluded that these oversights were offset in large part by his greater experience in the canning industry.

William correctly points out that Bonfield did not cite any authority supporting his use of the methodology he utilized in arriving at his opinion. But he offers no precedent imposing such a requirement as a condition for accepting an expert's opinion. And, if such failure can have an effect on the testimony, it seems to us that it would go only to the weight and credibility of the evidence — matters, as we have said, that are left to the discretion of the trial court. *See Bauer,* 154 Wis. 2d at 764, 454 N.W.2d at 31.

■

Bonfield testified that the figures he arrived at represented the fair market value of the business, and the trial court's decision indicates that it was persuaded that the methodology he used produced a reliable valuation of the fair market value of William's interest in the business. William has not persuaded us that the trial court's acceptance of Bonfield's method of arriving at his opinion was clearly erroneous.

### B. Use of a Weighted Average

William next argues that Bonfield's valuation was fatally flawed because there is no "foundation" for his use of a five-year weighted average in assessing the business's earnings. Again, we disagree.

In arriving at an earnings figure for the business, Bonfield used a weighted average, giving the greatest weight to the most recent year, 1991, and the least

weight to the most remote year, 1987. He offered the following explanation for his use of a weighted average:

> I'm trying to get the recent history of the company, and tried to use the most current year the highest rate, and the most distant year the lowest rate. Things change within a company, and things are different, and I want to get the most recent history to have the highest rate.

Bonfield testified that the weighted average gives a more accurate accounting of the recent history of the business's earnings and that it represents the best window of time for assessing fair market value. He said that his use of the weighted average was predicated on his experience in the canning industry and his involvement in similar transactions in the past.

While it may be, as William asserts, that there is a danger that such averaging might place extra emphasis on two very profitable years for the business (1989 and 1990), it also emphasizes the most recent year — in this case, a year in which the business lost a significant amount of money. Bonfield testified that the five-year weighted average was consistent with his past experience and within the bounds of his professional judgment. Again, we cannot say that it was clearly erroneous for the trial court to rely on his opinion.

### C. Choice of a Public Comparable

In estimating the business' fair market value based on its earnings, Bonfield used a publicly traded corporation, Stokely USA, as a comparable enterprise. William argues that Stokely is an inappropriate comparable because it was more dissimilar than similar to the Schorer companies.

401

Bonfield testified that when he values closely-held corporations, he always selects a comparable publicly traded company to establish a baseline value. He acknowledged that there were differences between the two canning operations but chose Stokely as a comparable because of its location, growing areas, product line and its use of a private label.

That choice was a matter of Bonfield's professional judgment; and while it may be open to criticism, the trial court found his explanation of the reasons for proceeding in that manner to be reasonable, and we cannot say such a finding was clearly erroneous.

### D. The Multiplier

To calculate a fair "earnings figure" — an appropriate rate of capitalization — for the business, Bonfield used multipliers extrapolated from information taken from the Stokely comparable. William argues that use of such multipliers were improper because they "lacked foundation" and were not supported by documentation but rather were simply "assumed" by Bonfield.

Bonfield, however, testified that he calculated the multipliers after examining information on Stokely that was publicly available. Because this aspect of Bonfield's testimony represents an exercise of his professional judgment based upon his experience in valuing similar businesses in the past and in working on acquisitions and mergers in the canning industry and is supported by facts of record, it was not clearly erroneous for the trial court to accept it.

### E. Use of a Premium and Discount

William makes a similar argument with respect to Bonfield's use of a "premium" and a "discount" in his analysis, contending that they, too, "lacked foundation."

Bonfield testified that he used a twenty percent "premium" to give added value to William's interest in the business because he holds controlling interest in the two companies. Bonfield also applied a twenty percent "discount" to account for the reduced marketability of the business's stock due to difficulties generally associated with finding buyers for closed corporations. Here, too, William has not persuaded us that it was not clearly erroneous for the trial court to rely on Bonfield's methodology on this point.

### F. Problems Facing the Business Enterprise

Finally, William argues that it was error to accept the Bonfield valuation because he failed to take into account problems that were facing the business, including a shortage of working capital and various "environmental" problems.

Bonfield testified, however, that he considered both of these factors as potential liabilities but, in the exercise of professional judgment, decided not to give them weight in his valuation. In addition, the trial court expressed considerable skepticism with respect to the asserted cash flow shortages, stating that while there could be legitimate reasons for the manner in which William made various expenditures on the business's behalf, "one must look at their timing and necessity," and that, doing so, "[o]ne can infer that they

represent, at least in part, a means by which to manipulate the cash position of the company."

As with William's other assertions, we are satisfied that the trial court's refusal to discount Bonfield's testimony for these reasons was not clearly erroneous.

The court's reliance on Bonfield's analysis and his ultimate valuation of William's interest in the business stemmed in large part from its determination that he was the more credible of the four experts — including Gunkel — testifying at trial. In accepting the Bonfield analysis, the court also discussed various problems with the other valuation methods, including those used by Gunkel. And while the superiority of competing methods is debatable, it is not for us to make the initial choice. Indeed, we might reach a different result were we in that position. Our task on appeal is only to determine whether it was clearly erroneous for the court to accept Bonfield's valuation; and, as we have said, it was not.

### III. Appreciated Value of Inherited Property

In dividing the property, the trial court included in the marital estate 448 shares of stock in the family business that William had inherited from his father. William claims the stock was inherited property specifically exempted from the marital estate under sec. 766.25, Stats., and that the trial court erred in including it. We disagree.

In including the stock in the estate, the court reasoned that because the business was in bankruptcy in the early 1980's, it had only a minimal value at that time, and that the appreciation in its value to present levels was the result of efforts and contributions by both William and Deborah.

After hearing testimony and argument on the subject, the trial court found that the appreciation was due to the "active efforts of company employees, [William] and also [Deborah]," stating:

> The facts establish that William . . . contributed more in time and effort directly to the business than did [Deborah]. She, however, also contributed in what may be described a more traditional sense. More importantly, however, it appears that the family work pattern was formulated by mutual consent. Furthermore, the efforts of [William] were to the exclusion of other business or marital income producing activities. He actively worked to increase the value of the business.
>
> . . . [I]t [is] evident from the testimony throughout the trial that [William] was the manager of the business. He was the decision maker and the person at whom the buck stopped. Because of this, his claim that the appreciation is nonmarital is unfounded.

The record substantiates that William was the chief executive and manager of the company and was a "hands-on" owner. He testified that during the course of the marriage he worked long, hard hours, sometimes six or seven days a week, building the business from a tiny operation into a multimillion dollar company. Indeed, he acknowledged on cross-examination that the value of the business, built up over the years of his marriage to Deborah, was due to his own hard work and the hard work of his employees, and that he was the one principally responsible for the success of the companies. On this record, we see no error in the court's inclusion of the stock in the marital estate.[2]

***

[2] William's assertion that the trial court abused its discretion by failing to address his legal arguments is unfounded. In

William argues, however, that even if the appreciation of the inherited property was due to the efforts of the marital partnership, that appreciation should remain separate property because the marital partnership was adequately compensated for William's efforts. We are not persuaded.

William cites cases from other jurisdictions for the proposition that the appreciation of a separate asset may remain separate "if the owning spouse has been compensated fairly for his or her efforts." Whatever the effect of such a proposition elsewhere, it has not been given legal status in Wisconsin.[3]

Section 767.255, Stats., excludes from the marital estate property that is either acquired by gift or inheritance or paid for with funds so acquired. Where, however, gifted or inherited property has appreciated in value during the marriage due to the efforts of both the owning and nonowning spouses, that appreciation will be included in the marital estate. *See Schwegler v. Schwegler*, 142 Wis. 2d 362, 366, 417 N.W.2d 420, 423 (Ct. App. 1987). "Thus, if during the marriage, both spouses contribute to the acquisition of property

---

concluding that the appreciated value of the inherited property was marital property because it was not directly acquired by inheritance or purchased with funds acquired by such means, the trial court implicitly rejected William's legal claims.

[3] While William's position is not supported by Wisconsin case law, the subject has been the focus of recent debate among the commentators, *see* Peggy L. Podell, Comment, *Enhanced Value of a Closely Held Corporation at the Time of Divorce: What Role Will Wisconsin's Marital Property Act Play*, 69 MARQ. L. REV. 82 (1985), and J. Thomas Oldham, *Separate Property Businesses that Increase in Value During Marriage*, 1990 WIS. L. REV. 585.

through their abilities and efforts, that property is part of the marital estate. *The property acquired may be the appreciation in value of an asset separately owned by one of the spouses." Haldemann v. Haldemann,* 145 Wis. 2d 296, 302, 426 N.W.2d 107, 109 (Ct. App. 1988) (emphasis added).

Wisconsin courts have interpreted sec. 767.255, Stats., to require an analysis of whether the cause of appreciation of the property sought to be excluded from the marital estate was passive or active. *See Wierman v. Wierman,* 130 Wis. 2d 425, 440–41, 387 N.W.2d 744, 751 (1986). Active appreciation robs the asset of its exclusionary status, while passive appreciation preserves the separate nature of the property. Thus, where the appreciated value of separate property is due solely to general economic conditions, such as inflation or normal appreciation of real estate values, the property remains separate. *Plachta v. Plachta,* 118 Wis. 2d 329, 334, 348 N.W.2d 193, 196 (Ct. App. 1984). However, where the appreciation of separate property is due to the efforts and abilities of the marital partnership, that appreciation becomes part of the marital estate. *Lendman v. Lendman,* 157 Wis. 2d 606, 612, 460 N.W.2d 781, 784 (Ct. App. 1990).

The trial court, as we have noted, found that the appreciation in value of William's inherited stock since the companies' bankruptcy several years earlier had resulted from the efforts of marital partnership and rejected William's claim that the appreciation was due to market factors outside his control. Under the authorities just cited, we see no error in that determination.

William argues that, even so, it was error for the court to designate the full value of the stock as marital property. It is, however, essentially a single-sentence argument unsupported by citation to authority, and we need not consider it further. *State v. Schaffer*, 96 Wis. 2d 531, 545–46, 292 N.W.2d 370, 378 (Ct. App. 1980). Suffice it to note, as we have done above, that the trial court did so based upon its determination that when the business was in bankruptcy several years earlier, its value was minimal and, as a result, essentially all of its present value was accumulated during the marriage and through the efforts of the marital partnership; and William does not appear to challenge the court's underlying assumptions on the point.

## IV. Tax Consequences

To effectuate its property division, the trial court ordered William to pay Deborah $1,461,052, in equal installments over a period of fifteen years. William sought reconsideration, asserting that he could not comply with that portion of the judgment without selling his stock in the family business, and that the tax consequences of such a sale should be considered by the court in dividing the property. The court denied his motion and he challenges that ruling.

■■■

In dividing the marital property upon divorce, the trial court should consider the tax consequences to each party. *Ashraf v. Ashraf*, 134 Wis. 2d 336, 343–44, 397 N.W.2d 128, 131 (Ct. App. 1986). If, however, a taxable event is not likely to occur, the court need not do so. *Ondrasek v. Ondrasek*, 126 Wis. 2d 469, 480, 377 N.W.2d 190, 194 (Ct. App. 1985).

The trial court denied William's reconsideration motion because there was no evidence in the record indicating that any sale of the business was imminent. In fact, the trial court found the opposite, stating that: "every effort of [William] has been to retain these companies at all costs. They represent a lifetime commitment to him rather than a transient investment designed to maximize tax loss prior to ultimate sale." We see no error in the trial court's denial of William's motion to reconsider the equalization payment portion of the judgment.

## V. Maintenance

Next, William argues that the trial court's maintenance award of $3,000 per month was excessive in light of the property division; he claims it will be impossible for him to satisfy that obligation.

The decision to award maintenance is left to the sound discretion of the trial court. *Lendman*, 157 Wis. 2d at 614, 460 N.W.2d at 784. We will not disturb an order of maintenance unless it is shown that the court exceeded its discretion in making the award. *City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 423, 491 N.W.2d 484, 493 (1992).

> [T]o determine whether the trial court properly exercised its discretion in a particular matter, we look first to the court's on-the-record explanation of the reasons underlying its decision. And where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which

we ourselves would agree. *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991) (footnote omitted).

In awarding maintenance to Deborah, the trial court considered several factors including: the length of the marriage, Deborah's earning capacity, the tax consequences of maintenance to both parties, the disparity in their earning abilities, the difference in their educational attainments, William's entire available income and his past practice of borrowing from the corporations, and the purported cash-flow problems at the business. Analyzing these factors, the court emphasized the fact that in the years prior to the divorce, William had received compensation from the business far in excess of his base salary even when the company lost money. The court also questioned the alleged cash flow problems and a number of recent capital expenditures on the part of the companies, expressing its concern that they were an aberration caused by William's manipulation of the business to advance his interests during the divorce.

The trial court's decision evinces an informed reasoning process focusing on fairness to the parties. It was in all respects a proper exercise of discretion with which we may not interfere. *Burkes*, 165 Wis. 2d at 590, 478 N.W.2d at 39.

## VI. *Effective Date of Divorce*

As we noted at the outset, the trial court took the case under advisement following the July, 1991, trial and issued its decision several months later, making it effective as of the last day of trial. William objects, arguing, without elaboration, that there is no authority

for such action and that it will cause "practical problems" for the parties.

Not only has William offered no authority in support of his contention that the court's action was legally erroneous, he has not shown that he has been in any way prejudiced by that action. He asserts only that "had either party died prior to the rendition of judgment, the court would have lost jurisdiction," (an event that never transpired) and that because "the parties were considered married as of January 1, 1992 . . . the tax consequences of married parties attached." He does not explain the arguments further and we reject them in similar summary fashion. *See Fritz v. McGrath*, 146 Wis. 2d 681, 686, 431 N.W.2d 751, 753 (Ct. App. 1988) (appellate court generally will not consider arguments broadly stated but never specifically argued).

*By the Court.*—Judgment affirmed.