GUNDRUM, J.[1]
¶1 R.T.H. appeals from an order for involuntary commitment pursuant to WIS. STAT. ch. 51.[2] He asserts "Ozaukee County fail[ed] to meet its burden to prove by clear and convincing evidence that R.T.H. was dangerous under Chapter 51."[3] We disagree and affirm.
Background
¶2 R.T.H. resided at the home of his mother and father; his brother also resided with their parents until June 2017. Due to concerns about R.T.H.'s increasingly disturbing behavior, the three family members joined the County in petitioning for examination of R.T.H., submitting affidavits in support of the petition. Pursuant to court order, R.T.H. was examined by Drs. Robert Rawski and Joan Kojis. A subsequent commitment hearing was held at which both doctors testified. The circuit court concluded that grounds for committing R.T.H. had been met because he is mentally ill, a proper subject for treatment, and is dangerous because he "evidence[d] behavior within one or more of the standards" under WIS. STAT. § 51.20(1). The court ordered R.T.H. committed for six months to the care and custody of Ozaukee County to be treated in a locked inpatient facility at Columbia St. Mary's Hospital Ozaukee, and following release from the facility, that R.T.H. "comply with treatment and conditions set forth by the Department of Human Services responsible for follow-up supervision." R.T.H. appeals.
Discussion
¶3 As relevant here, for the circuit court to order R.T.H. committed, the County had to prove by clear and convincing evidence that he is mentally ill, a proper subject for treatment, and dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.See § 51.20(1)(a), (13)(e). R.T.H. does not dispute the circuit court's conclusions that he is mentally ill and a proper subject for treatment.[4] He insists, however, that the court erred in concluding the County met its burden to prove he was dangerous. We disagree.
¶4 "[T]he circuit court's findings of fact are reviewed for clear error, but application of those facts to the statute and interpretation of the statute are reviewed independently." Winnebago Cty. v. Christopher S. , 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109. "[W]e accept reasonable inferences from the facts available to the circuit court." Id. (citation omitted).
¶5 Considering the "total picture" of R.T.H. based upon the evidence before it, the circuit court expressed that this was a "very, very close case." Close though it was, the court had to make a decision, and in doing so, concluded R.T.H. met the standard for dangerousness under subd. paras. b. and c. of § 51.20(1)(a) 2. We agree with the court both that this is a very close case but also that the dangerousness standard of both of these subdivision paragraphs was met.
¶6 Under WIS. STAT. § 51.20(1)(a) 2.b., the County was required to prove, as relevant here, that R.T.H. "[e]vidences a substantial probability[5] of physical harm to other individuals as manifested ... by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." Under § 51.20(1)(a) 2.c., the County was required to show, as relevant here, that R.T.H. "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts ..., that there is a substantial probability of physical ... injury to himself or herself or other individuals."
¶7 At the commitment hearing, the circuit court considered the affidavits of R.T.H.'s father, mother and brother, all of which the court found credible. R.T.H.'s mother averred that R.T.H. was "using marijuana" despite her and R.T.H.'s father's opposition to having it on their property; R.T.H. "had a complete meltdown around June of this year and started accusing us of trying to kill him because he was aware of a life insurance policy we had on him"; R.T.H. was "barely coherent during the meltdown, was pacing, had rigid posture and hand gestures and was verbally abusive to us"; "[s]ince the meltdown, [R.T.H.] has consistently been verbally abusive and defiant to us" and is "constantly swearing"; R.T.H. "slams doors and stomps up and down steps"; the week before the petition for R.T.H.'s commitment was filed, R.T.H. "accused [his mother] of trying to poison him with toxic substances and became very agitated"; R.T.H. advised them that "he is doing chemical experiments in his room to produce toxic substances"; R.T.H. "accused [his mother] of undercooking meat, causing him to get parasites"; and R.T.H.'s parents were in the process of evicting R.T.H.
¶8 R.T.H.'s brother averred that "in late June, [R.T.H.] walked into my room with a voltage meter, waved it around my iPod dock and then claimed the readings proved it had been bugged." When the brother told R.T.H. to leave his room, R.T.H. "said I was being suspicious and was probably in on it. He said that my behavior was proof I was working against him." The brother further averred that "[w]hen [R.T.H.] was having problems with his car he claimed it was because our father had put a tracking device on it that messed with the car's electrical systems." About three months before the hearing, R.T.H.
began going on about magnetic insects. He mentioned government death lists and how he was at risk of being put on one. He said that being on them means the government can kill you if they please without a judge or trial. He accused both myself and my father of being involved in these conspiracies. He believed I was a hacker and my father was bugging his room with magnetic insects.
¶9 R.T.H's father stated in his affidavit that he "lately ha[s] become very concerned that [R.T.H.'s] mental health and judgment have deteriorated to the point that there is a high probability he will injure himself or others." He averred that in the two months prior to the filing of the petition, R.T.H. "has been severely paranoid, claiming that we have been trying to poison him and have infiltrated his computer and cell phone. [R.T.H.] believes we are subjecting him to strong electrical fields and using toxic chemicals near him." R.T.H. "has driven while either sleep deprived or under the influence of the drugs he is ingesting" and has "admitted to doing toxic chemical experiments in our home." R.T.H. "has outbursts of swearing and yelling at us. He has left large knives laying around the house for days. We never know when he is going to explode at us. He has a hair trigger emotionally."
¶10 Clinical psychologist Dr. Joan Kojis testified at the hearing that she conducted an evaluation of R.T.H. that included reviewing hospital and police records and his family member's individual affidavits, as well as "consulting with Ozaukee County Crisis" and interviewing R.T.H. himself. She testified to her opinion that R.T.H. was dangerous under WIS. STAT. ch. 51 because
he believes his parents are trying to kill him, and he's been very verbally abusive and defiant with them and that there was record that he had left large knives laying around. His parents had expressed fear for him. He also is a quite intelligent young man and has a degree in science and was doing chemical experiments and ordering chemicals on line.
R.T.H.
was very uncooperative with his parents. He did express to me that he believed his parents are trying to kill him for an insurance policy; and that he's been verbally abusive and defiant to them. And I would say leaving large knives around is threatening to them. So ... I would see that as dangerousness, that he perceives them as after him and might want to defend himself.
Kojis agreed there was a "pattern of acts and omissions" and substantial "impaired judgment" by R.T.H. R.T.H. was also "quite uncooperative with the hospital staff, did not want to take medications, doesn't believe he has a mental illness, and is quite paranoid about that too."
¶11 Key testimony of Kojis as to dangerousness tracked the language of WIS. STAT. § 51.20(1)(a) 2.b.:
THE COURT: .... Doctor, your feeling is that there's a-it evidences a substantial probability of physical harm to others, manifested by others being placed in reasonable fear of violent behavior-
[KOJIS]: That's correct.
THE COURT: -and serious physical harm as evidenced by recent overt acts, attempts or threats to do that? You see the knives coupled with his mental health situation as coming within that category?
[KOJIS]: I do.
Kojis added that she believed the chemical experiments R.T.H. was doing in his bedroom also constituted overt acts indicating dangerousness. When asked by R.T.H.'s counsel if she believed such experiments would be considered dangerous when they are conducted by someone with a biochemistry degree, such as R.T.H., Kojis responded, "It could be, yeah. Someone with a biochemistry degree who is not thinking clearly and whose thoughts are very paranoid and delusional, yes."
¶12 Although the County only needed to show that R.T.H. met the dangerousness standard under one of the five subdivision paragraphs under WIS. STAT. § 51.20(1)(a)2., here the evidence supported the circuit court's conclusion that R.T.H. met the standard under both subd. paras. b. and c. of § 51.20(1)(a) 2.
¶13 The evidence showed that R.T.H. is mentally ill, delusional and paranoid, prone to aggressive "outbursts" related to his delusions and paranoia, and dangerously unpredictable. His father's observations of R.T.H.'s behavior led him to aver that R.T.H.'s "mental health and judgment have deteriorated to the point that there is a high probability he will injure himself or others." During one described meltdown, R.T.H. was "barely coherent" and "pacing, had rigid posture and hand gestures and was verbally abusive" and defiant toward his family members. Of notable concern to his father and Kojis, R.T.H. has, as averred by his father, "left large knives laying around the house for days" and the family "never know[s] when he is going to explode at us. He has a hair trigger emotionally." Kojis expressed her concern about R.T.H.'s paranoid belief that his parents were trying to kill him and viewed his action of both leaving knives lying around the house and conducting "chemical experiments in his room to produce toxic substances," as R.T.H.'s mother averred, as overt acts evidencing his dangerousness.
¶14 In arguing that the evidence did not sufficiently support the circuit court's conclusion of dangerousness, R.T.H. relies heavily upon the report and testimony of Dr. Rawski, who concluded that R.T.H. did not meet the dangerous requirement under the statute. However, the circuit court was not convinced by Rawski's opinion as to dangerousness, stating:
I have a great deal of respect for Dr. Rawski, but I just don't feel he had as much information; and maybe because of what he does, he is a little desensitized to the situation. He sees people that run the whole gamut of dangerousness, whereas I'm applying what I think is the reasonable standard.
In short, on the question of dangerousness, the court did not find Rawski's report or testimony convincing but instead embraced the testimony of Kojis on this point, which the court was at liberty to do. As our supreme court has stated:
[T]he circuit court, as the trier of fact, "was free to weigh the expert's testimony when it conflicted and decide which was more reliable; to accept or reject the testimony of any expert, including accepting only parts of an expert's testimony; and to consider all of the non-expert testimony in deciding whether [there] was [a substantial probability] that Kienitz would commit future acts of violence."
State v. Kienitz , 227 Wis. 2d 423, 441, 597 N.W.2d 712 (1999) (citations omitted); see also Schorer v. Schorer , 177 Wis. 2d 387, 396-97, 501 N.W.2d 916 (Ct. App. 1993) ("The weight and credibility to be given to the opinions of [expert witnesses] is uniquely within the province of the fact finder." (alteration in original; citation omitted) ).
¶15 In arguing that the requirements of WIS. STAT. § 51.20(1)(a) 2.c. were not met, R.T.H. cites to our unpublished decision in Chippewa Cty. v. M.M. , No. 2017AP1325, unpublished slip op. (WI App May 1, 2018). In that case, however, the question was whether the evidence supported the conclusion that M.M. was a danger to himself because of how others in the community might react to M.M.'s abnormal behavior. Id ., ¶¶19-22. We essentially found it too speculative, based on the evidence presented, "that someone else would attack and harm M.M." See id ., ¶¶16-22. In the case now before us, however, we consider the likelihood that R.T.H. will harm others, based upon his prior behavior, which is very different than attempting to predict how unknown persons might react to unknown behavior at some point in the future.
¶16 The circuit court understandably identified this case as a "very, very close case." That said, on appeal, R.T.H. bears the burden of showing the circuit court erred in finding that the County met its burden of demonstrating by clear and convincing evidence that R.T.H. was dangerous under subd. paras. b. and c. of WIS. STAT. § 51.20(1)(a)2.See Gaethke v. Pozder , 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. Here, although admittedly a close call, the evidence supported the court's conclusion that R.T.H. was dangerous under both standards. R.T.H. has not met his appellate burden.
By the Court. -Orders affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(d) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Although R.T.H.'s notice of appeal indicates he is also appealing the involuntary medication and treatment order entered by the circuit court, he does not include the issue in his Statement of Issues or in his argument in his brief-in-chief. We conclude R.T.H. abandoned the issue on appeal. See A.O. Smith Corp. v. Allstate Ins. , 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("[I]n order for a party to have an issue considered by this court, it must be raised and argued within its brief.... [A]n issue raised on appeal, but not briefed or argued, is deemed abandoned.").

R.T.H. also asserts he was not provided timely notice "of the standards of dangerousness the court ultimately found he satisfied." We decline to address this issue as it is raised for the first time on appeal. See Brooks v. Hayes , 133 Wis. 2d 228, 241, 395 N.W.2d 167 (1986) ("The general rule is that this court will not consider arguments raised for the first time on appeal or review."). Recognizing that this issue is being raised for the first time on appeal, R.T.H. says we "could also reach the merits of [his] procedural due process claims under the plain error doctrine." R.T.H. fails, however, to develop a "plain error doctrine" argument, and we do not address undeveloped arguments and will not abandon our neutrality to develop arguments for a party. See ABKA Ltd. P'ship v. Board of Review , 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) ; Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

Substantial evidence on these elements, some of which evidence is not detailed in this decision, was presented at the hearing.

"Substantial probability" means "much more likely than not." See State v. Curiel , 227 Wis. 2d 389, 414, 597 N.W.2d 697 (1999).