COURT OF APPEALS
DECISION
DATED AND FILED

August 3, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1168**

STATE OF WISCONSIN

Cir. Ct. No. 2018FA1043

IN COURT OF APPEALS
DISTRICT II

DAWN M. QUARTANA,

   PETITIONER-APPELLANT,

 V.

MICHAEL J. QUARTANA,

   RESPONDENT-RESPONDENT.

APPEAL from a judgment of the circuit court for Waukesha County: LEE S. DREYFUS, JR., Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dawn M. Quartana appeals a judgment of divorce from Michael J. Quartana.[1] Dawn challenges the amount and duration of maintenance. She also claims that the circuit court erroneously valued Michael's minority interest in two community-based rental facilities. We affirm.

## BACKGROUND

¶2 Michael and Dawn were married in 1997. They divorced in 2020, after approximately twenty-three years of marriage. Michael and Dawn have three children. At the time of the divorce, two of the children were adults. The third child graduated from high school three months after the divorce was granted. At some point during the divorce proceedings, Dawn moved from the marital residence to an apartment. The children remained in the house with Michael. The parties agreed that child support and placement orders were not required, but they disagreed on the issues of maintenance and property division.

¶3 In January of 2020, the circuit court held a two-day trial to determine maintenance and property division. At the trial, Michael testified that he worked as a loan officer for Bell Bank. A stock purchase agreement from 2013 shows that, for part of the marriage, Michael owned an interest in Assured Mortgage. Michael testified that Assured Mortgage merged with Bell Bank in October of 2018. As a result of the merger, Michael received an equity payout and became an

---

[1] Because the parties have the same last name, we refer to them by first names for clarity.

There are two signed judgments of divorce in the record. One is dated May 14, 2020, and one is dated May 26, 2020. In an order denying Michael Quartana's motion to dismiss, we concluded that the May 26 judgment is the appealable document.

employee of Bell Bank.[2] As an employee of Bell Bank, Michael's salary was determined using a base amount plus commissions. A year-end paystub in Michael's financial disclosure statement showed that his gross income in 2019 was $169,023. An income statement showed that Michael's net monthly income was $9,084 per month.

¶4 Michael also invested in and owned several real estate properties. As material, Michael testified that he had a one-third ownership interest in two community-based rental facilities, Autumn Creek I and Autumn Creek II. The Autumn Creek properties paid a monthly distribution to Michael. The parties stipulated that Michael's full interest in Autumn Creek I was worth $119,361, and his full interest in Autumn Creek II was worth $274,085. They disagreed, however, on what discount should be applied to calculate the value of Michael's ownership interests.

¶5 Michael called the only expert witness, Scott Wildman, a certified public accountant and business evaluator, to testify on the fair market value of Michael's ownership interests. Wildman testified that he reviewed the operating agreements, which established a formula or "purchase price adjustment" for valuing a disassociating owner's interest. The formula provided that, in the event an owner leaves, the owner is entitled to 95 percent of the fair market value for Autumn Creek I and 90 percent of the fair market value for Autumn Creek II.

¶6 Wildman testified that, following the principles of fair market value, it is "typical" to discount a minority interest due to a lack of control and

---

[2] At the time of the trial, $93,874 of the payout remained in a checking account. The circuit court awarded $46,937 to Michael and $46,937 to Dawn.

marketability. According to Wildman, a "lack of control discount gives consideration to the membership interest that doesn't have complete control over the entity[.]" Wildman explained that the noncontrolling interest does not "have the power to sell the underlying property, … to buy additional properties, to declare distributions, [or] to make other major decisions." Wildman further testified that a "discount for lack of marketability covers the liquidity of the ownership interest…. [I]n other words, there's not an active primary market for a one-third ownership interest in either of these entities. So it suffers from a lack of liquidity." Wildman told the court that, in his professional opinion, it was "appropriate" to apply a 5 to 10 percent discount for a lack of control and a 10 to 15 percent discount for a lack of marketability. Wildman explained that Michael's "one-third ownership interest [would be] a noncontrolling interest" and that "there's no active market for [Michael's] ownership interest."

¶7 Wildman then testified about a chart prepared by Michael. The chart used two steps to determine the value of Michael's interests. First, it determined the fair market value of Michael's interests using Wildman's discounts for lack of control and marketability. The chart showed that, when applying a 5 percent discount for lack of control and a 10 percent discount for lack of marketability, the estimated fair market value of Michael's one-third interest in Autumn Creek I was $102,054, while the estimated fair market value of Michael's one-third interest in Autumn Creek II was $234,343. Second, the chart applied the purchase-price adjustments in the operating agreements. The fair market value of $102,054 for Autumn Creek I was reduced by 5 percent to $96,951, or 95 percent of fair market value. The fair market value of $234,343 for Autumn Creek II was reduced by 10 percent to $210,909, or 90 percent of fair market value.

¶8     Dawn also testified. She told the court that, during the marriage, she was a homemaker. Dawn testified that she did the cooking, took the children to doctor's appointments and school activities, ran errands, and cleaned the house. Dawn claimed that she had been diagnosed with fibromyalgia, rheumatoid arthritis, and bulging and ruptured disks, but that she did not file a form from her doctor with the court because she "didn't think it was necessary." Dawn admitted that she accrued credit card debt during the pendency of the divorce proceedings. She stated that she had "no problem" assuming responsibility for her personal spending, but she asked that any family expenses be considered marital debt. The parties stipulated that Dawn had an earning capacity of $25,000 per year. Dawn's financial disclosure statement showed approximately $8,435 in monthly expenses, including $1,200 for food and household supplies and $4,173 for installment payments.[3]

¶9     On March 12, 2020, the circuit court granted a divorce to the parties and ordered Michael to pay Dawn maintenance of $4,000 per month plus 25% of Michael's W2 employment income over $169,000 and any distributions from business entities, including Autumn Creek I and Autumn Creek II, for five years. The court accepted Wildman's valuation of the Autumn Creek properties and awarded one-half of the marital property to Dawn and one-half of the marital property to Michael. To equalize the property division, the court ordered Michael to pay Dawn $484,802.

---

[3] At the trial, Dawn's attorney clarified that Dawn's monthly expenses without the $4,000 for debt payments were $6,715.

## DISCUSSION

### I. *Maintenance*

¶10    Dawn makes three arguments in support of her claim that the circuit court erroneously exercised its discretion when setting the amount and duration of maintenance.    Specifically, Dawn claims that the circuit court erred when it: (1) limited maintenance to five years; (2) calculated Michael's income; and (3) considered potential investment income.  We address each contention in turn.

¶11    Circuit courts have discretion in determining the amount and duration of maintenance.  *LaRocque v. LaRocque*, 139 Wis. 2d 23, 27, 406 N.W.2d 736 (1987).  We will not disturb a circuit court's discretionary decisions regarding the calculation of maintenance unless the court erroneously exercised its discretion.  *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶17, 269 Wis. 2d 598, 676 N.W.2d 452.  A circuit court erroneously exercises its discretion when it fails to consider relevant factors, bases its award on factual errors, makes an error of law, or grants an excessive or inadequate award.  *Id.*, ¶18.

¶12    The "touchstone" of a proper maintenance award is set by statute. *LaRocque*, 139 Wis. 2d at 32.  WISCONSIN STAT. § 767.56(1c) (2019-20)[4] sets forth a list of factors for a circuit court to consider when determining the amount and duration of a maintenance award:

> (a)  The length of the marriage.
>
> (b)  The age and physical and emotional health of the parties.

---

[4] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

(c) The division of property made under s. 767.61.

(d) The educational level of each party at the time of marriage and at the time the action is commenced.

(e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(f) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(g) The tax consequences to each party.

(h) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, if the repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(i) The contribution by one party to the education, training or increased earning power of the other.

(j) Such other factors as the court may in each individual case determine to be relevant.

These factors "are designed to further two distinct but related objectives in the award of maintenance: to support the recipient spouse in accordance with the needs and earning capacities of the parties (the support objective) and to ensure a fair and equitable financial arrangement between the parties in each individual case (the fairness objective)." *LaRocque*, 139 Wis. 2d at 33.

¶13  When determining the appropriate maintenance award, courts should start with "the proposition that the dependent partner may be entitled to 50 percent of the total earnings of both parties." *Bahr v. Bahr*, 107 Wis. 2d 72, 85, 318

N.W.2d 391 (1982). This amount may then be adjusted following reasoned consideration of the statutorily enumerated maintenance factors. *Id.* Notwithstanding the proscribed starting point, "[t]he payment of maintenance is not to be viewed as a permanent annuity." *Vander Perren v. Vander Perren*, 105 Wis. 2d 219, 230, 313 N.W.2d 813 (1982). Rather, maintenance "is designed to maintain a party at an appropriate standard of living, under the facts and circumstances of the individual case, until the party exercising reasonable diligence has reached a level of income where maintenance is no longer necessary." *Id.*

¶14 First, Dawn claims that the circuit court erroneously exercised its discretion when it limited maintenance to five years. She asserts that, under the circumstances in this case, five years is too short a time period for her to become self-sustaining to the level she enjoyed during the marriage. Specifically, Dawn points out that the circuit court failed to consider that, at the time of the divorce, she was fifty years old, had custodial responsibilities for one of the children, had a limited earning capacity and no meaningful work experience, had a limited education, and suffered from medical issues. We are not persuaded that the circuit court erroneously exercised its discretion.

¶15 Contrary to Dawn's claim, the record reveals that the circuit court considered the statutory factors. In an extensive oral decision, the circuit court noted that Michael and Dawn had a "long-term marriage" of twenty-three years. It recognized that Dawn was almost fifty-one years old and acknowledged that Dawn may have health issues. It found, however, that Dawn did not provide any medical documentation showing that her health issues would preclude her from working. The circuit court explained: "[O]ther than [Dawn's] indication of the

health issues … we didn't have really any supporting documentation [showing] they rise to the level where it can and may preclude employment[.]"

¶16    The circuit court also considered each party's income and the impact of the property division.  It found that Dawn's stipulated income of $25,000 was reasonable given that Dawn did not have any significant skills, training, education, or employment history.  The court determined that Dawn's equalization payment of $484,000, combined with a $285,000 payment for rental properties, would provide Dawn with a cash estate of approximately $770,000.  The court concluded that Dawn could invest the $770,000 to generate approximately $35,000 to $40,000 a year.  The circuit court said:

> There's a reasonable likelihood that … if properly and appropriately invested that that kind of sum would be able to produce an income stream … somewhere in the range of [$35,000] to [$]40,000 per year, without having to invade the principal at all.  But that would be up to [Dawn], whatever she does with the money.

¶17    Finally, the circuit court considered Dawn's proposed budget of $8,000 a month and any resulting tax liability.  It noted that neither party requested child support because the youngest child would graduate from high school approximately 90 days after the trial.  It found Dawn's proposed household expenses of $1,200 a month did not have "any significant or substantial support," noting that she was a single person.  It also determined that Dawn's request for $4,173 per month for debt payments was not supported with any documentation and that the marital debt was paid for.  It found that Dawn would have "little or no income tax liability" and that "$4,000 per month, based upon the $169,000 annualized salary to [Michael] and the $25,000 imputation of income to [Dawn] is almost exactly a 50/50 equalization of the income[.]"

¶18 Considering all of these factors, the circuit court concluded that five years was an appropriate term for maintenance. It determined that five years would give Dawn the "opportunity to get things in place so that she has the ability to support herself under all circumstances," adding:

> That will give [Dawn] an opportunity one, if she chooses to, go back to school, get an additional education…. This will give her time to in that respect, get her finances in order. … give an opportunity for [Dawn] to … be able to grow her investments over time, and to make arrangements so that she has a viable and supportable income stream going forward[.]

The circuit court's oral ruling shows that in determining the length of Dawn's maintenance, it considered the dual objectives of support and fairness and made findings regarding the factors listed in WIS. STAT. § 767.56. In effect, Dawn is asking this court to view the evidence differently than the circuit court viewed it, with an emphasis on evidence that best supports her position. This is not appropriate under our standard of review. *See Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 644, 340 N.W.2d 575 (Ct. App. 1983) (if more than one reasonable inference can be drawn from the evidence, we must accept the one chosen by the circuit court).

¶19 Next, Dawn challenges the amount of maintenance, claiming that the circuit court based the $4,000 figure on an erroneous calculation of Michael's income. She claims that the court improperly determined that Michael's 2019 income was $169,000 per year. Dawn contends that the circuit court should have

used the average of Michael's W2 income from 2015 to 2018 instead, which would have produced an average income of $315,207 per year.[5] We disagree.

¶20    In its oral decision, the circuit court explained why it rejected Dawn's request to use the average of Michael's W2 income from 2015 to 2018. It noted that a "substantial portion" of Michael's income at that time was due to Michael's ownership interest in Assured Mortgage, which merged with Bell Bank in 2018. The court noted that the remaining proceeds of the sale became marital property that were divided between the parties. It thus concluded that "[i]t is not viable for the court to look at those past numbers for the purpose of determining maintenance" and used Michael's 2019 salary of $169,000 as "the base to go from." The court also determined that Michael's salary was "variable" and noted that Michael had additional income from the Autumn Creek I and Autumn Creek II investments. To take the variability of Michael's earnings into account, the circuit court thus ordered Michael to pay 25% of his W2 employment income over $169,000 and 25% of any distributions from business entities, including Autumn Creek I and Autumn Creek II, for five years. These findings are not clearly erroneous.

¶21    Michael's income from 2015 through part of 2018 is from a business Michael no longer owns. On appeal, Dawn does not dispute that Assured Mortgage merged with Bell Bank in October of 2018 or that Michael became an employee of Bell Bank. Under these facts, it was reasonable for the circuit court

---

[5] In her brief on appeal, Dawn uses two numbers for Michael's average income: $310,362 and $315,207. In her trial brief, Dawn asked the circuit court to base Michael's income on the average of Michael's income from 2015-2018, which she claims would be $315,207. Accordingly, for the purposes of this appeal, we will use Dawn's figure of $315,207.

11

to reject Dawn's $315,207 figure and instead rely on Michael's 2019 year-end paystub showing that Michael earned $169,023 as an employee of Bell Bank. *See Hefty v. Hefty*, 172 Wis. 2d 124, 134, 493 N.W.2d 33 (1992) (court may base maintenance on amount and nature of income at the time divorce is granted). Dawn also fails to take into account the fact that $169,000 is merely a starting point for calculating Michael's income. The circuit court awarded Dawn an additional 25 percent over and above Michael's base salary of $169,000. Using this calculation, Dawn's maintenance payments will increase as Michael's income increases.

¶22     Finally, Dawn claims that the circuit court erroneously considered the $35,000 to $40,000 of potential interest in determining the term and amount of maintenance. She appears to challenge both the factual and legal basis for this determination. Dawn first contends that the circuit court erroneously exercised its discretion because its factual analysis of her potential interest income is "purely hypothetical" and "unsupported[.]" This claim is belied by the record.

¶23     As we have seen, the court determined that Dawn would receive approximately $484,000 from the equalization payment and $285,000 from the sale of property, for a total of $770,000 in "cash-related assets[.]" It reasoned that, "if properly and appropriately invested," Dawn would be able to earn $35,000 to $40,000 per year. The circuit court acknowledged that it "may take a while, understanding we have [a] reduced income rate environment," but concluded that five years of maintenance would give Dawn time to "get her finances in order." Based on these findings, the circuit court had a basis in the record for its conclusion that the property settlement would permit Dawn to earn investment income. *See Wright v. Wright*, 2008 WI App 21, ¶40, 307 Wis. 2d 156, 747 N.W.2d 690 (the fact that entities are not currently earning an income is not a

factor which should eliminate them from the maintenance consideration); ***Liddle v. Liddle***, 140 Wis. 2d 132, 154-55, 410 N.W.2d 196 (Ct. App. 1987) (circuit court had basis in the record for conclusion that property settlement would permit wife to have investments).

¶24    Dawn also contends that any future interest she may earn by investing the marital property was an improper factor for the court to consider because an asset may not be counted both as marital property subject to division and as part of the party's future income.  While Dawn is correct that the law does not permit the double counting of an asset for both property division and maintenance, *see* ***Kronforst v. Kronforst***, 21 Wis. 2d 54, 64, 123 N.W.2d 528 (1963), this principle does not apply to *income* from assets awarded in a property division.  As we explained in ***Wright***:

> Income from assets awarded to a spouse as part of an equal property division are generally included in calculating that spouse's income for maintenance.  The double-counting rule prevents the principal value of the asset from being counted twice.  The future income generated from the asset is separate and distinct from the asset itself, and therefore can be included in the spouse's income for maintenance calculations.

***Wright***, 307 Wis. 2d 156, ¶42 (citation omitted); *see also* ***McReath v. McReath***, 2011 WI 66, ¶¶53, 60, 335 Wis. 2d 643, 800 N.W.2d 399 (value of investment property is separate from the income it generates).

¶25    Based on these principles, we conclude that the circuit court appropriately considered any future interest Dawn could earn when calculating her income.  The marital property had a principle value of $770,000 in "cash-related assets" at the time of the property division.  This amount is separate and distinct from any future interest Dawn could earn if she elects to save the assets and earn

income from them. *See Wright*, 307 Wis. 2d 156, ¶42. Consequently, the circuit court did not double count Dawn's property settlement.

¶26 In sum, the circuit court did not erroneously exercise its discretion when it awarded Dawn $4,000 per month plus 25% of Michael's W2 employment income over $169,000 and any distributions from business entities, including Autumn Creek I and Autumn Creek II, for five years. The court considered the relevant statutory factors, applied the correct law, and reached a conclusion that a reasonable judge could reach.

II. *Property Valuation*

¶27 Dawn claims that the circuit court erroneously calculated the fair market value of Michael's one-third interests in Autumn Creek I and Autumn Creek II. The valuation of marital assets is a finding of fact that we will not disturb unless it is clearly erroneous. *See Schorer v. Schorer*, 177 Wis. 2d 387, 396, 501 N.W.2d 916 (Ct. App. 1993). We are guided by the rule that in "divorce actions, trial courts are not required to accept any one method of valuation over another." *Id.* at 399. A circuit court is free to make its own assessment of competing expert opinions and "determine the fair market value of a business asset based upon the nature of the business." *Sharon v. Sharon*, 178 Wis. 2d 481, 492, 504 N.W.2d 415 (Ct. App. 1993).

¶28 The circuit court must value assets at their fair market value. *Schorer*, 177 Wis. 2d at 399. Fair market value is the price that property will bring when offered for sale by one who desires but is not obligated to sell and bought by one who is willing but not obligated to buy. *Liddle*, 140 Wis. 2d at 138. "This definition requires consideration of what factors buyers and sellers find

relevant when negotiating a deal. Thus, disadvantages or liabilities of ownership may dramatically affect the fair market value of property." *Id.*

¶29 The circuit court accepted Wildman's formula for determining the fair market value of Michael's interests in the Autumn Creek properties, stating in its oral decision that it was "satisfied [the interests] should be discounted." The court noted that Michael's interests were "not necessarily readily saleable[.]" It thus "accept[ed] the analysis and the basis as to how it was reached … from the testimon[y] from … Wildman under the circumstances" and concluded that "Autumn Creek I [had a fair market] value of $96,851 [sic[6]] [and that] Autumn Creek II [had a fair market] value of $210,909."

¶30 Dawn claims that this valuation is erroneous because the circuit court should have used the purchase price discounts in the operating agreements for Autumn Creek I and Autumn Creek II. She points out that the formulas only apply 5 and 10 percent discounts, respectively, for determining the fair market value of Michael's interests. Dawn thus claims that the court erred when it relied on Wildman's formula, which further reduced the value of Michael's interests by 5 percent for lack of control and 10 percent for lack of marketability, because the court did not "expand on why it chose to further reduce the value other than stating it agrees with the expert analysis." Dawn's argument misses the first step in the calculation.

¶31 The ownership agreements for Autumn Creek I and Autumn Creek II provide that Michael is entitled to 90 and 95 percent of fair market value.

---

[6] The correct figure is $96,951.

Specifically, the ownership agreement for Autumn Creek I provides: "In the event the Company votes to purchase the dissociating Member's Interest, the Company shall pay to the dissociating Member(s), or his estate, trust, successors or assigns an amount equal to 95 percent (95%) of the fair market value of the dissociating Member's Interest[.]" Similarly, the operating agreement for Autumn Creek II provides: "In the event the Company votes to purchase the dissociating Member's Interest, the Company shall pay to the dissociating Member(s), or his estate, trust, successors or assigns an amount equal to 90 percent (90%) of the fair market value of the dissociating Member's Interest[.]" The agreements do not, however, provide a specific formula for calculating fair market value, providing only that:

> The fair market value of the Interest shall be determined by agreement of the dissociating member or his representative, and the remaining members. If there is no agreement, the fair market value of the Interest shall be determined by a certified and licensed appraiser to be chosen by the Members entitled to vote on the matter in sufficient time to allow for a decision[.]

Accordingly, the first step in the analysis is to determine fair market value. Only after the fair market value has been calculated can the purchase price discounts be applied.

¶32    In this case, Wildman testified that when determining the fair market value of Michael's interests, discounts were "appropriate" to account for a lack of control and marketability. As Wildman explained, the 5 and 10 percent discounts were appropriate because there was "no active market" for Michael's noncontrolling ownership interests. The circuit court reasonably relied on this testimony. *See id.* at 146-47 (minority interest discount can be an appropriate factor in valuation). Moreover, "[t]he duty of testing an expert's opinion is upon counsel, not the court." *Id.* at 150. Dawn did not provide the circuit court with

16

expert testimony contradicting Wildman's formula for determining fair market value or challenge the resulting calculations in the chart presented at trial. Accordingly, we conclude that the circuit court properly considered all of the relevant information available to it and went through a rational decision-making process with regard to the value of Michael's interests in the Autumn Creek properties.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.